**FORD MOTOR CREDIT COMPANY,**
Appellant,

v.

**FIRST STATE BANK OF SMITHVILLE,**
Texas, Appellee.

No. 12–83–0092–CV.

Court of Appeals of Texas,
Tyler.

June 21, 1984.

Rehearing Denied July 19, 1984.

**438**

David C. Duggins, Clark, Thomas, Winters & Shapiro, Austin, for appellant.

Yerger Hill, III, Payne & Vendig, Dallas, for appellee.

COLLEY, Justice.

Defendant/appellant Ford Credit appeals from an adverse judgment rendered in favor of plaintiff/appellee Bank in a bench trial of the issue of the priority of competing security interests held by the parties in the inventory of a failed Ford dealership in Smithville. We affirm.

The record shows that Jeb Fredrickson, following negotiations during the summer of 1977 with Ford Motor Company, obtained approval as a dealer with a franchise to sell Ford products under the corporate name, Jeb Fredrickson Ford-Mercury, Inc. (Fredrickson).

Fredrickson, on July 1, 1977, executed a floor plan financing agreement with Ford Credit in order to finance the dealership's purchase of new rolling stock from Ford Motor Company. The agreement contained a security agreement granting Ford Credit a security interest in the merchandise purchased under the floor plan. Ford Credit concedes that such security agreement did not grant a security interest in the inventory of Fredrickson. On August 16, 1977, Ford Credit filed a financing statement with the Secretary of State signed by Fre-

drickson which described the collateral covered in the following language:

(1) new and used motor vehicles, tractors, trailers, semi-trailers, mobile homes, farming implements and other farming or industrial appliances and equipment, *and other inventory and equipment* with manufacturers' certificates and certificates of title or ownership relating thereto;

(2) accessories *and replacement parts of or for any of the above;* and

(3) accounts, contract rights, chattel paper and general intangibles. (Emphasis added.)

Fredrickson arranged with Bank to loan it $35,000 for operating capital. These funds were used as a part of the purchase price for parts inventory purchased by Fredrickson from the former Ford dealership, Campbell-Battle. On September 26, 1977, the Bank filed a properly executed financing statement with the Secretary of State on the debtor's inventory. The statement described the collateral in the following language: "All parts and equipment now owned and hereafter acquired and used in operation of business."

On September 27, 1977, Fredrickson executed a security agreement in favor of Bank granting a security interest in the inventory described in its financing statement filed on September 26, 1977. Also on September 27, 1977, the sale of the dealership from Campbell-Battle to Jeb Fredrickson Ford-Mercury, Inc. was closed, and on the same day, the Bank advanced funds in the amount of $35,000 for the purchase of the inventory.

On August 29, 1979, Ford Credit cancelled its floor plan financing for Fredrickson and took possession of all new and used vehicles located on the dealership premises because Fredrickson had violated the agreement by selling new vehicles purchased with Ford Credit's funds without payment to Ford Credit for the vehicles (sold out of trust). On the same day, Fredrickson executed a second financing statement and security agreement with Ford Credit covering various types of collateral, but also clearly describing for the first time in a security agreement the parts, inventory, and equipment of Fredrickson. Ford Credit filed a properly executed financing statement on the security interest on August 30, 1979.

The evidence is undisputed that Ford Credit never made any loan or advances to Fredrickson for the purchase of parts or equipment or any character of inventory for the dealership. The parties by agreement sold the parts, equipment, and inventory of Fredrickson, and the proceeds thereof were paid into the registry of the trial court to await the final adjudication of the priority issue between the parties.

Campbell, a partner in the former dealership, testified on cross-examination as follows:

Q It's my understanding that Mr. Fredrickson came and started working at your dealership while you were still running it. Is that right?

A Not correct. No, sir.

Q How did that work?

A Well, Jeb was quite a while being approved. The company took seemed like a long time approving his package. I realized those things. They were a long time approving my package too. He and his wife had already moved there. And he had finally been approved about this time.

Q About the 14th of September?

A Yes, sir. And I was introducing him to our customers to get him familiar with the territory and the community he would be dealing with. And he asked me about taking over on the 15th I believe. I said, 'No, I'll go through the 15th. That'll end half of the month. And from the 16th, beginning the 16th, from then on you can have whatever you can make or lose until we close.'

Q So he actually took—Jeb Fredrickson actually took over operations on the 16th of September, 1977?

A  Yes, sir. It was still our business but he was—

Q  But he was operating it?

A  Yes, sir.

Q  Okay. And then you actually didn't sign the bill of sale and close the deal until a later date. The 27th I believe, wasn't it?

A  27th of September, yes, sir.

The trial court signed interlocutory judgments in this cause against Fredrickson in favor of Ford Credit and Bank for $69,-791.01 and $44,079.56 respectively, together with attorneys' fees in the amount of $7,000.00 each and postjudgment interest. These interlocutory orders were incorporated in the final judgment signed on August 24, 1981. The judgment below also found and adjudicated that Bank had the first priority security interest in the proceeds from the sale of the inventory to the extent of its judgment debt against Fredrickson, and that following the satisfaction of Bank's debt, Ford Credit is entitled to the remaining funds to be applied to its debt.

Ford Credit contends under its first four points of error that the undisputed evidence establishes as a matter of law that Bank failed to qualify its admitted purchase money security interest in the inventory for the special priority provided by Sec. 9.312(c); and that the evidence is legally and factually insufficient to support the trial court's conclusion that Bank's security interest has priority over Ford Credit's security interest in the inventory; and that the priority of Ford Credit's security interest was established as a matter of law.

Our decision turns on the application and interpretation of various sections of the Texas Business and Commerce Code, including Sec. 9.312(c), to the undisputed facts hereinabove discussed.[1]

We note at the outset that if Bank's purchase money security interest does not qualify for the special priority set forth in Sec. 9.312(c), then the "first to file rule" set forth in Sec. 9.312(e)(1) would apply since Ford Credit was the first to file and its security interest would have priority.

Section 9.312(c) in pertinent part reads:

(c) A perfected purchase money security interest in inventory has priority over a conflicting security interest in the same inventory and also has priority in identifiable cash proceeds received on or before the delivery of the inventory to a buyer if

(1) the purchase money security interest is perfected at the time the debtor receives possession of the inventory; and

(2) the ... purchase money secured party gives notification in writing to the holder of the conflicting security interest if the holder had filed a financing statement covering the same types of inventory (i) before the date of the filing made by the purchase money secured party, ...; and

(3) the holder of the conflicting security interest receives any required notification within five years before the debtor receives possession of the inventory; and

(4) the notification states that the person giving the notice has or expects to acquire a purchase money security interest in inventory of the debtor, describing such inventory by item or type.

Section 9.312(e) provides that in cases not governed by other rules of the code and of such section that priority between conflicting security interest in the same collateral shall be determined in accordance with the following rules:

(1) conflicting security interest rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.

(2) so long as conflicting security interests are unperfected, the first to attach has priority.

---

1.  All references to sections or subsections are to the Texas Business and Commerce Code, and references to the code generally are to the Texas Business and Commerce Code.

We first address the notification requirements of 9.312(c)(2), (3) and (4). Bank pleaded, and introduced into evidence, a letter dated August 11, 1977, written by Bank to Ford Motor Company advising that the bank was committed to make a "capital loan" to Fredrickson in the amount of $35,000.00 for the "operation" of Fredrickson upon approval by Ford Motor Company of Fredrickson as a dealer. The letter further advised Ford Motor Company of the repayment terms of five years and certified that Fredrickson had on deposit in the bank as of the date of the letter, the sum of $38,000.00. The evidence shows that a copy of this letter was forwarded to Ford Credit by Ford Motor Company at some time prior to September 14, 1977 (the date of approval of Fredrickson as a dealer by Ford Motor Company). Bank argues that such letter constituted sufficient compliance with the requirements of 9.312(c)(2), (3) and (4). We disagree. First, the letter was not mailed by Bank to Ford Credit, and secondly, the letter did not expressly notify Ford Credit that Bank intended to take a purchase money security interest in a properly described inventory of Fredrickson as required by the code. Thus, we reject Bank's contention that the letter constituted substantial compliance with the code's requirements above set forth under paragraphs (2), (3) and (4) of Subsection (c). Bank presents yet another, and in our opinion, meritorious argument regarding the application in this case of paragraphs (2), (3) and (4) of Sec. 9.312(c), namely, that the bank was not required under such code provisions to give notification to Ford Credit because Ford Credit was not a "holder of a conflicting security interest" in the inventory within the meaning of Sec. 9.312(c)(2).

Section 1.201(37) defines a "security interest" to mean "an interest in personal property ... which secures payment or performance of an obligation." Under the code it is clear that "... a security interest is perfected when it has attached and *all* of the applicable steps for perfection have been taken." Section 9.303(a). (Emphasis added.) In addition, the UCC comment (1) following the last-cited section of the code states that the property becomes subjected to a security interest *when the security interest attaches.* Section 9.203 provides, in part, that a security is not enforceable against a "... debtor or third party ... and does not attach unless: (1) ... the debtor has signed a security agreement ...; (2) value has been given; and (3) the debtor has rights in the collateral."

We hold that the bank was not required, in order to qualify its *purchase money security interest* in the inventory for the special priority accorded it by Sec. 9.312(c), to give Ford Credit notification of its intent to acquire the purchase money security interest in the inventory, because Ford Credit was not a *holder of a security interest* in such collateral enforceable against either Fredrickson or the Bank on or before September 26, 1977, for the reason that no security agreement granting a security interest to Ford Credit in the inventory had been executed between Ford Credit and Fredrickson before that date.

Next we turn to Ford Credit's contentions that the evidence is both legally and factually insufficient to support the court's findings that Bank's security interest has first priority and that the findings are against the great weight of the evidence (point 4 claims Ford Credit's security interest was shown by the evidence to be entitled to first priority as a matter of law). The gist of Ford Credit's argument is that the uncontradicted testimony of Johnny Campbell, as above set forth, establishes that Fredrickson received possession of the inventory before Bank perfected its purchase money security interest on September 27, 1977. In deciding this complex issue, we deem it appropriate to consider the obviously favored status enjoyed by purchase money security interest holders under the provisions of Sec. 9.312 of the code. Section 9.107(2) states that a security interest is a purchase money security interest "... to the extent that it has been taken by a person who by making advances ... gives value to enable a debtor to acquire rights in ... collateral if such value is in fact so used." In other words, under

the last-quoted section, the funds advanced by the creditor must be actually used by the debtor to purchase the collateral in which the security interest is taken before such interest becomes a purchase money security interest. Section 9.312(c)(1), presumably in order to reinforce the provisions just quoted of Sec. 9.107(2), requires that before the priority status may be claimed by the purchase money secured party, "the purchase money security interest [must be] perfected at the time the *debtor* receives possession of the inventory; ...." (Emphasis added.) Here, Ford Credit does not dispute that Bank's security interest is in fact a purchase money security interest. Ford Credit claims only that the testimony of Campbell, quoted above, establishes that before the purchase money security interest of Bank was perfected on September 27, 1977, Fredrickson "operated" the Campbell-Battle dealership from September 16, 1977, until the closing of the sale on September 27, 1977, and that such facts show that Fredrickson "received possession" of the inventory before Bank perfected its purchase money security interest in such collateral. No Texas cases have been cited by the parties which control our decision on the facts of this case. Both the federal and other state cases cited by Ford Credit in support of its argument are distinguishable, in our opinion, on the facts, and are therefore inapposite.

An analogous factual situation is presented in *Brodie Hotel Supply, Inc. v. U.S.*, 431 F.2d 1316 (9th Cir.1970). There Brodie sued the United States, representing the Small Business Administration, to determine priority of conflicting security interests in certain restaurant equipment. At trial, a summary judgment was rendered in favor of Brodie, and the 9th Circuit affirmed. The facts in *Brodie* show that Brodie in 1959 sold the equipment to Standard Manufacturing Company for use in a restaurant in Anchorage. Standard became bankrupt, and Brodie repossessed the equipment but left it in the restaurant. With Brodie's consent, Lyon took possession of the restaurant and began operations thereof on June 1, 1964. During the remainder of the summer of 1964, Brodie and Lyon negotiated the terms under which Lyon was to purchase the equipment. On November 2, 1964, Lyon borrowed money from the National Bank of Alaska, and as security for the repayment of the loan, executed a chattel mortgage covering the equipment which consisted of 159 separate types of items. The bank assigned that mortgage to the Small Business Administration. On November 4, 1964, the bank filed a financing statement showing the Small Business Administration as the assignee. On November 12, 1964, Brodie delivered a bill of sale covering the equipment, and on the same day, Lyon executed a chattel mortgage naming Brodie as mortgagee. Brodie filed a financing statement on November 23, 1964 (November 22, 1964, fell on a Sunday). The State of Alaska had, prior to these transactions, adopted the UCC.

In affirming the summary judgment, the 9th Circuit reasoned that under the definition of "debtor," contained in Sec. 9.105(d), although Lyon was in actual possession of the collateral for several months prior to the perfection of Brodie's purchase money security interest by filing on November 23, 1964, Lyon did not become "a debtor" with respect to the "collateral" until November 12, 1964, when he received the bill of sale from Brodie. In coming to its conclusion to uphold the priority of Brodie's purchase money security interest on the facts presented, the 9th Circuit Court commented that any ambiguity as to the meaning of the word "debtor," as used in U.C.C. Sec. 9.312(4) (Tex.Bus. & Com.Code Sec. 9.312[d]), should be resolved in favor of the favored status accorded purchase money secured interest holders under the provisions of Sec. 9.312. Thus, that court concluded that "... the term 'debtor' as it is used in this particular priority statute ... means 'the person who owes payment or other performance of the obligations secured.'" In our case, Fredrickson did not become a "debtor" as defined in Sec. 9.105(a)(4), and as used in 9.312(c)(1), i.e., a "... person who owes

payment or performance *of the obligation secured* ....." until he signed the security agreement to Bank on September 27, 1977, the date on which Bank perfected its purchase money security interest in the inventory.

■ Moreover, under this record we also reject Ford Credit's contention that Fredrickson received possession of the inventory within the meaning of 9.312(c)(1) before the perfection of Bank's purchase money security interest. While Campbell's testimony clearly shows that Campbell-Battle voluntarily turned over the operation of the dealership to Fredrickson on September 16, 1977, it cannot be said that from the facts and evidence here that the conduct of Campbell-Battle in permitting Fredrickson to "operate the business" amounted to surrendering possession of the inventory of its business to Fredrickson. The evidence affirmatively shows that actual possession and control of the inventory was not turned over to Fredrickson until September 27, 1977, at which time the former dealership executed a bill of sale to Fredrickson upon receipt of the bank's advance of the $35,-000.00 to pay on the inventory. Certainly, under the facts here, Fredrickson had no actual physical control over the entire inventory of parts owned by Campbell-Battle Ford before the closing of the sale contemplated by the agreement between those parties and the delivery by Campbell-Battle of its bill of sale on September 27, 1977. Further, it seems clear that the requirements of Sec. 9.312(c)(1) serve to protect a first filing creditor *with a security interest in after-acquired property of the debtor* who makes subsequent advances against the after-acquired inventory in the possession of the debtor, and therefore the ostensible property of the debtor. Ford Credit *had no security interest in the inventory as of September 27, 1977,* made no advances to Fredrickson on the inventory *at any time,* and did not learn that Fredrickson was in possession of the inventory before September 27, 1977, until after the default by Fredrickson on its floor plan financing agreement on August 29, 1979, or later. Under these circumstances nei-

ther the purposes of the Code, nor the principles of equity would be subserved by permitting Ford Credit to successfully claim priority of its security interest in the inventory by virtue of Sec. 9.312(e)(1).

For all the reasons stated we overrule Ford Credit's first four points of error.

Ford Credit contends under its point of error five that the court erred in finding that it gave no value for the security agreement executed in August 1979. This finding is now immaterial under our decision on the first four points, and it is overruled.

Ford Credit practically concedes that its sixth point of error claiming trial court error in permitting the bank president Mays and Jeb Fredrickson to testify over Ford Credit's objections regarding the import of various written documents admitted into evidence and the intent of those witnesses in the execution thereof violated the parol evidence and best evidence rules, is without merit. We agree. The point is overruled.

The trial court's judgment is affirmed.